[No. A039697. First Dist., Div. Three. Dec. 14, 1988.]

RUTH BAKANAUSKAS, Plaintiff and Appellant, v.
NANCY URDAN et al., Defendants and Respondents.

**COUNSEL**

Jeffrey J. Carter and William I. Parks for Plaintiff and Appellant.

Fred M. Feller, York, Buresh & Kaplan, Renee Welze Livingston, Bledsoe, Cathcart, Leahy, Starr & Hardiman, Kincaid, Gianunzio, Caudle & Hubert, Eliot R. Hudson and Andrew B. Thomason for Defendants and Respondents.

**OPINION**

**STRANKMAN, J.**—Plaintiff and appellant Ruth Bakanauskas vacated her apartment in the City of Berkeley (Berkeley) following the filing of an unlawful detainer action against her. By the instant action, she contends her eviction violated (1) the Berkeley Tenants Rights Amendments Act of 1982 (also known as Measure G, codified at Berkeley Mun. Code, § 13.76.010 et seq.[1] ), which restricts tenant evictions to allow for owner occupancy of rental property, and (2) BMC sections 21.52.070 and 19.60.020, which regulate the conversion of rental property to community apartment projects. The trial court granted summary judgment against appellant on her complaint, from which she appeals. We affirm.

I

*Background Facts*

From January 1981 through July 1985, respondent Nancy Urdan was the sole owner of a three-unit residential property located on Hearst Avenue in Berkeley (rental property). In July 1985 she entered into a contract to sell a one-half undivided interest in the rental property to respondent Edward McClure. On July 19, 1985, she executed a grant deed conveying the one-half interest to McClure. On that same date, she and McClure entered into a "Tenants in Common Agreement" pursuant to which Urdan was entitled to exclusive occupancy of unit No. 1 and McClure was entitled to exclusive occupancy of unit No. 3. The grant deed and a written notice of the tenants-in-common agreement were recorded on July 24, 1985.

At that time, all three units were occupied by tenants. Unit No. 1 was rented to Bruce Dudak; unit No. 2 was rented to Aaron Dritz and Matt Passel; and unit No. 3 was rented to appellant. Appellant, in opposition to the motion for summary judgment, challenged Urdan's declaration that she rented out unit No. 2 in early July 1985. Urdan's declaration, however, was supported by a telephone service note for Aaron Dritz, dated July 10, 1985,

---

[1] All further references to the Berkeley Municipal Code shall be BMC.

and a canceled check from Leonard Dritz, dated July 11, 1985, for the first month's rent.

On July 24, 1985, McClure delivered to appellant a 30-day notice of termination of tenancy, informing her of his new ownership interest in the rental property and his intention to occupy unit No. 3.

In August 1985, Urdan entered into a contract to sell her remaining one-half interest in the rental property to respondent Deborah Kei Williams. By grant deed executed on September 12, 1985, and recorded September 17, Urdan and McClure conveyed to Williams a one-half interest in the rental property. Williams became a successor-in-interest to Urdan's rights under the tenants-in-common agreement, and moved into unit No. 1.

When appellant ignored McClure's 30-day notice, he filed an unlawful detainer action against her. Appellant then vacated her unit, and McClure moved in.[2]

## II

### Owner-occupancy Eviction

Measure G, section 13 thereof, enumerates the grounds entitling a landlord to recover possession of a rental unit. Section 13, subdivision (a)(9) (codified at BMC, § 13.76.130A.9), provides that a landlord may recover possession of a rental unit for his or her own occupancy as a principal residence, if certain conditions are met, as follows: "The landlord [may seek] in good faith to recover possession for his or her own use and occupancy as his or her principal residence . . . . For the purposes of this subsection 13.a.(9), the term landlord shall be defined as *the owner of record, as of the time of giving of a notice terminating the tenant's tenancy, . . . holding at least a 50% interest in the property* . . . . *The landlord may not recover possession under this subsection 13.a.(9) if a comparable unit was, at the time of the landlord's decision to seek to recover possession of the rental unit, already vacant and available in the property,* or if a comparable unit thereafter becomes vacant in the property at any time until the earlier of the tenant's surrender of possession of the premises . . . ." (Italics added.)

■ Appellant contends that her eviction violated Measure G because McClure was not the owner of record holding a 50 percent interest in the

---

[2] In February 1986, Urdan, McClure, and Williams entered into a mutual rescission of the tenants-in-common agreement due to concern regarding the outcome of litigation pending in the Appellate Department of the Alameda County Superior Court involving issues similar to those presented here. (See *Adler* v. *Elphick* (1986) 184 Cal.App.3d 642 [229 Cal.Rptr. 254].) The rescission does not affect our determination of the issues before us.

rental property on July 24, 1985, the date he served the notice terminating her tenancy.

Appellant's contention is squarely contradicted by the record, including a copy of the grant deed conveying to McClure a 50 percent interest in the rental premises, which was recorded on July 24. The only evidence submitted by appellant to controvert this evidence was copies of newspaper clippings advertising the sale of a one-third interest in the rental premises, and an all-inclusive deed of trust executed by McClure in favor of Urdan encumbering an undivided one-third interest in the rental premises. Such evidence, however, does not negate the fact of McClure's undivided one-half ownership interest acquired by grant deed.

■■■ Appellant further contends that a comparable unit—No. 2—was vacant and available at the time she received the notice terminating her tenancy on July 24, 1985.[3] In support of this contention she notes that Urdan failed to produce any rental agreement executed by Aaron Dritz or Matt Passell. She also submitted her own declaration, among others, stating that because she was disabled and therefore homebound, she was able to verify that unit No. 2 remained vacant until late August 1985.

As stated *ante,* the telephone service note indicating the installation of phone service in the name of Aaron Dritz on July 10, 1985, and the canceled check dated July 11, 1985, for his first month's rent, strongly support Urdan's declaration that unit No. 2 was rented out, if not occupied, as of July 11, 1985.

Regardless, however, of whether unit No. 2 was "vacant and available," the record shows that, as a matter of law, there was no other "comparable" unit in the rental premises at the time of appellant's eviction. ■■■ BMC section 13.76.130 does not provide a definition of or any standards for ascertaining what is a comparable unit. We therefore must construe that term in accordance with its apparent legislative purpose, and render it reasonable and fair to the parties affected thereby, after considering the consequences that will flow from a particular interpretation (*County of San Diego* v. *Muniz* (1978) 22 Cal.3d 29, 36 [148 Cal.Rptr. 584, 583 P.2d 109]; *Vittal* v. *Long Beach Unified Sch. Dist.* (1970) 8 Cal.App.3d 112, 120 [87 Cal.Rptr. 319].)

---

[3] BMC section 13.76.130A.9 provides in part that evidence that a comparable unit was vacant and available in the property within 90 days prior to the date of a notice terminating the tenant's tenancy shall create a presumption that such unit was vacant and available at the time of the landlord's decision to seek to recover possession of the premises. The presumption stands unless and until the contrary is proven by a preponderance of the evidence.

█ We first note Black's Law Dictionary's definition of "comparable accommodation" in the context of rent control: "Within the rule that it is the rent generally prevailing on the freeze date for comparable accommodations in a defense-rental area that determines rent that may be charged, two accommodations are 'comparable' if they are sufficiently similar to be regarded by an expert as of sufficiently equal rental value or if they are sufficiently similar so that an expert taking as a standard the rent prevailing for one and making allowances for such differences as would be reflected in rental value would be able to determine the appropriate corresponding rent for the other. [Citation.]" (Black's Law Dict. (5th ed. 1979) p. 255, col. 2.)

Such definition appropriately applies to the term used in the context of rent control legislation mandating equal rent for comparable rental units or determining reasonable rental increases. (See, e.g., *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365, 368-369 [228 Cal.Rptr. 726, 721 P.2d 1111].) That is not the context in which the term is used in our case. █ While different rental units may be sufficiently similar to warrant equal rent, many factors may make one unit more desirable than another for an owner who wishes to occupy one as his or her principal residence. Because the apparent purpose of the code section is to allow landlords to occupy one of their own rental units as their personal residence when, in good faith and not for retaliatory or other unlawful purposes, they wish to do so, reasonable subjective factors affecting the desirability of a unit for a particular landlord must be considered. Otherwise, a landlord could be deprived, possibly indefinitely, of his or her own property which he or she desires, for personal reasons, to occupy as a personal residence, while the benefits of the property as a residence could be enjoyed indefinitely by the tenant. Such result would render the statute unconstitutionally confiscatory. (See *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165-169 [130 Cal.Rptr. 465, 550 P.2d 1001].)

█ Here, Urdan's declaration explained that the units are situated such that unit No. 1 is closest to Hearst Avenue and unit No. 3 is furthest away from Hearst Avenue. Being furthest away, unit No. 3 is least affected by street noise, especially the bedroom which is at the back of the unit. Both units Nos. 1 and 2 have entrances which face onto the driveway, while unit No. 3 has an entrance which faces onto the yard. Unit No. 3 is closer to the yard and therefore has a more pleasing view than the other two. As opposed to unit No. 2, unit No. 3 shares a wall with only one other unit. Unit No. 3 has two closets, while units Nos. 1 and 2 have only one. In the McClure declaration, McClure reiterates the differences among the units and states that for these reasons, he did not consider units Nos. 1 and 2 comparable to unit No. 3.

In opposition, appellant asserted that unit No. 3 was inferior as a residence because unit Nos. 1 and 2 have front as well as rear access while unit No. 3 has only access from the backyard; unit No. 1 has excellent natural light while unit No. 3 has poor natural light; and unit No. 1 has a view of trees and a skyline while unit No. 3 has a view of a garage and trash cans.

These declarations show that, regardless of whether unit No. 3 may be considered superior to the other units based upon certain objective factors, there are marked differences which distinguish one from the other. These differences could reasonably make any one unit more desirable than the others as a personal residence depending upon one's individual tastes and criteria. Indeed, while not necessarily true in all cases, it would be unusual to find a three-unit apartment building without such differences making one unit more personally desirable as a residence than the others. "Comparable" units would more likely be found in an apartment complex with numerous units having identical floor plans and similarly situated in relation to streets and geographical surroundings.

For these reasons, we find the evidence is uncontroverted that there are sufficient marked differences between unit No. 3 and the other two units such that the other two are not comparable for occupancy as a personal residence.

We therefore conclude the trial court correctly found that, as a matter of law, at the time McClure delivered the notice terminating tenancy of unit No. 3, there was no other comparable unit vacant and available.

### III

*Community Apartment Project Regulations*

■ Appellant contends that the sale by Urdan to McClure and Williams of a one-half interest each in the rental property, coupled with the tenants-in-common agreement entitling them to exclusive occupancy of a particular unit, constituted the creation of a "community apartment project" in violation of BMC section 21.52.070. That section provides in relevant part that "no application for approval of a tentative subdivision map or parcel map to create a condominium project, community apartment project, or stock cooperative containing apartments which have been previously occupied as rental units shall be accepted for filing unless the vacancy rate is determined to be five percent or greater."

Urdan never filed an application for approval of a tentative subdivision map or parcel map creating a community apartment project. Appellant

contends, however, that Urdan's conveyances to McClure and Williams created a de facto community apartment project which violated BMC section 21.52.070.

Berkeley's regulation of community apartment projects is authorized by the Subdivision Map Act (Gov. Code, §§ 66410-66499.37; *Adler* v. *Elphick, supra,* 184 Cal.App.3d 642, 646.) The Subdivision Map Act requires, with certain exceptions, a tentative and final map for subdivisions creating five or more parcels of land (Gov. Code, § 66426) and a parcel map for subdivisions creating four parcels or less (Gov. Code, § 66428). Government Code section 66424 defines "subdivision" to include a community apartment project under Civil Code section 1351 (hereafter section 1351). Section 1351, subdivision (d), defines community apartment project as "a common interest development in which an undivided interest in land is coupled with the right of exclusive occupancy of any apartment located thereon."[4]

Civil Code section 1352 states that a common interest development, including a community apartment project, "is created *whenever a separate interest coupled with an interest in the common area ... is, or has been, conveyed,* provided, all of the following are recorded: [¶] (a) A declaration. [¶] (b) A condominium plan, if any exists. [¶] (c) A final map or parcel map, if [required by the Gov. Code]." (Italics added.) A "separate interest" in a community apartment project is defined as "the exclusive right to occupy an apartment . . . ." (§ 1351, subd. (*I*)(1).)

Here, Urdan never conveyed to McClure or Williams an exclusive right to occupy a unit coupled with an undivided interest in common area. The grant deeds executed in favor of McClure and Williams conveyed an undivided one-half interest in the rental property, creating a tenancy in common. (Civ. Code, §§ 685, 686.) The grant deeds neither make any reference to nor incorporate any documents creating an exclusive right of occupancy. For these reasons, Urdan did not record a "declaration" and did not seek to file a tentative, final, or parcel map; accordingly, no community apartment project was created under Civil Code section 1352.

Appellant contends that the unrecorded tenants-in-common agreement, by which the parties agreed among themselves to the exclusive right of

---

[4] Section 1351, subdivision (c), defines "common interest development" as "a real property development: [¶] (1) Which consists or will consist of separately owned lots, parcels, areas, or spaces with either or both of the following features: [¶] (A) One or more additional contiguous or noncontiguous lots, parcels, areas, or spaces owned in common by the owners of the separately owned lots, parcels, areas, or spaces. [¶] (B) Mutual, common, or reciprocal interests in, or restrictions upon, all or a portion of these separately owned lots, parcels, areas, or spaces, or both. [¶] (2) And, in which the owners of the separately owned lots, parcels, areas, or spaces have rights, directly or indirectly, to the beneficial use and enjoyment of the lots, parcels, areas, or spaces referred to . . . ."

occupancy of particular units, created a de facto community apartment project which unlawfully circumvented the purpose and policies of Berkeley's rent control law. A similar argument was made and rejected in *Adler* v. *Elphick, supra,* 184 Cal.App.3d 642.

In *Adler,* the three plaintiffs in an unlawful detainer action purchased residential property in Berkeley. Two plaintiffs intended to occupy one unit and the other plaintiff the other unit, all of which were occupied by tenants at the time of the purchase. One of the tenants refused to comply with the notice to vacate the premises, and tendered as an affirmative defense in the unlawful detainer action the contention that plaintiffs had created a community apartment project in violation of BMC section 21.52.070. The trial court concluded the defense could not be presented to the jury because there was no evidence of individual exclusive ownership of any part of the property.

On appeal, the court affirmed, finding that no community apartment project had been created. The court noted that the grant deed by which title was passed to the plaintiffs created an undivided one-half interest in one of the plaintiffs and a similar interest in the other two. The deed did not create any separate interests in the property or any right to exclusive occupancy of either unit. No plaintiff separately owned any one unit. (*Adler* v. *Elphick, supra,* 184 Cal.App.3d at p. 648.) In contrast, a separate interest in a community apartment project is "something capable of being separately assessed for property tax purposes and of being separately conveyed." (*Id.,* at p. 647.) The court rejected the argument that the parties' informal agreement as to occupancy created a separate interest: "Although [plaintiff] argues that a 'community apartment' may be created informally through an oral or written lease between the cotenants, or even by implication from their actions, we do not agree. Instead we conclude that the right to exclusive occupancy of a particular unit must be specified on the deed itself in order for a 'community apartment project' to be created." (*Ibid.,* fn. omitted.)

Here, unlike the case in *Adler,* the parties entered into a tenants-in-common agreement, written notice of which was recorded simultaneously with the grant deed from Urdan to McClure. Such agreement, however, did not operate to convey a separate interest in the rental property to Urdan, McClure, or Williams which could, in turn, be separately conveyed by them, or which could be separately assessed for property tax purposes. Such an interest could be created by grant deed alone. Otherwise, as noted by the *Adler* court, the transfer of title to multi-unit properties would require endless court adjudication regarding the effect of agreements between former co-owners concerning rights of exclusive occupancy in any of the units.

For these reasons, we conclude the record establishes as a matter of law that the conveyances by Urdan to McClure and Williams did not create a community apartment project subject to or in violation of BMC section 21.52.070.

## IV

### *Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.